IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

JULY 1997 SESSION

FILED

October 24, 1997

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | C.C.A. NO. 01C01-9610-CC-00430 |
| Appellee, | ) | |
| | ) | MAURY COUNTY |
| VS. | ) | |
| | ) | HON. JIM T. HAMILTON, |
| KING DAVID JOHNSON, JR. | ) | JUDGE |
| | ) | |
| Appellant. | ) | (Second-degree murder) |


FOR THE APPELLANT:                FOR THE APPELLEE:


**HERSHELL D. KOGER**              **JOHN KNOX WALKUP**
P.O. Box 1148                     Attorney General & Reporter
Pulaski, TN  38478
     (On appeal)                  **SARAH M. BRANCH**
                                  Counsel for the State
**LIONEL R. BARRETT, JR.**         450 James Robertson Pkwy.
Washington Square Two, Suite 417  Nashville, TN  37243-0493
222 Second Ave.
Nashville, TN  37201              **MIKE BOTTOMS**
     (At trial)                        -and-
                                  **ROBERT C. SANDERS**
                                  District Attorney General
                                  P.O. Box 459
                                  Lawrenceburg, TN  38464


OPINION FILED:_____



**CONVICTION AFFIRMED;
REMANDED FOR RESENTENCING**



JOHN H. PEAY,
Judge

**O P I N I O N**

The defendant was indicted in June 1993 for first-degree murder of his girlfriend, Valerie Duke. A jury convicted him on February 27, 1996, of second-degree murder, and after a hearing, he was sentenced as a Range I standard offender to twenty years in the Tennessee Department of Correction. In this appeal as of right, the defendant challenges the sufficiency of the evidence and the appropriateness of his sentence. After a review of the record and applicable law, we affirm his conviction and remand the cause for resentencing.

Shortly after midnight on May 13, 1993, the defendant called 911 and said that his girlfriend, Valerie Duke, had been shot. Officers answered the call and emergency personnel transported the victim to a nearby hospital in Columbia, Tennessee. Officers then took the defendant to the police department for questioning. Shortly after the victim had been transported to Vanderbilt Hospital, she died as a result of a gunshot wound to her forehead. The defendant was subsequently arrested and charged with first-degree murder.

A defendant challenging the sufficiency of the proof has the burden of illustrating to this Court why the evidence is insufficient to support the verdict returned by the trier of fact in his or her case. This Court will not disturb a verdict of guilt for lack of sufficient evidence unless the facts contained in the record and any inferences which may be drawn from the facts are insufficient, as a matter of law, for a rational trier of fact to find the defendant guilty beyond a reasonable doubt. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

When an accused challenges the sufficiency of the convicting evidence, we

2

must review the evidence in the light most favorable to the prosecution in determining whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). We do not reweigh or re-evaluate the evidence and are required to afford the State the strongest legitimate view of the proof contained in the record as well as all reasonable and legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

Questions concerning the credibility of witnesses, the weight and value to be given to the evidence, as well as factual issues raised by the evidence are resolved by the trier of fact, not this Court. Cabbage, 571 S.W.2d 832, 835. A guilty verdict rendered by the jury and approved by the trial judge accredits the testimony of the witnesses for the State, and a presumption of guilt replaces the presumption of innocence. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).

At trial, the State presented the testimony of several officers who investigated the shooting death of Valerie Duke. Don Rose, a detective with the Columbia Police Department, testified that he had been among the first officers to arrive at the victim's house. Rose testified that the defendant had been standing on the front porch with another officer. Rose further testified that he found the victim lying on the bottom bed of a set of bunk beds. Her head was on a pillow at the top of the bed. Rose testified that blood had been on the pillow and on the window shade behind the bed. He testified that he found a nine millimeter semiautomatic weapon near the bed and that the weapon, a Glock, was loaded with nine bullets.

Rose testified that the defendant had told him that the victim had shot herself. He testified that the defendant had said that he had been at the victim's house

3

to fix a window and that he had brought his gun with him. He further testified that the defendant had said the victim had been looking at the gun when it just went off. Rose also testified that he had interviewed the defendant at the police department later that morning. He testified that he had said to the defendant, "You know and I know that you are the one that shot her," and the defendant nodded his head in agreement. Rose also testified that during the interview, the defendant had asked about the victim's condition and that upon learning of her death, the defendant had wept.

Troy Potts, a patrolman with the Columbia Police Department, arrived at the victim's house after receiving a radio call about the shooting. He testified that the defendant had been outside the house waiting for help to arrive. He further testified that upon entering the victim's home he saw two small children on the floor of the living room. He then entered one of the back bedrooms and found the victim lying on the bunk bed. Potts testified that while he was surveying the scene, the defendant had repeatedly said, "I told her not to touch the gun."

Two other officers with the Columbia Police Department gave similar testimony about the morning of the shooting. Lieutenant James Hanvy testified that the gun had been found partially stuck under the pillow near the left side of the victim's head. He further testified that the children, ages six and eight, had been taken to the victim's mother's house later that morning.

The State then presented Sergeant Johnny Hunter of the Metropolitan Nashville Police Department as an expert in blood spatter pattern analysis. Hunter testified that by studying a blood spatter, he can determine what type of force caused the pattern. In this case, he testified that the blood on the pillow beneath the victim's head was low velocity blood, meaning it was free flowing from the victim. This type of pattern

4

is typically associated with blood dripping from a wound. He further testified that the blood found on the window shade behind the bunk bed was typical of high velocity spatter. From studying the spatter, he was able to determine that the actual impact occurred seven to twelve inches away from the window shade. He explained that this determination was consistent with the distance from the window shade to the pillow. He also testified that the impact occurred about six or seven inches above the mattress, or about the distance a person's head would be raised by using a pillow on the mattress. He testified that the victim had been lying down when she was shot, but that he could not determine the direction from which the bullet had been traveling.

Dr. Gretel Harlan, an Assistant Davidson County Medical Examiner at the time, performed the autopsy on the victim. She testified that a bullet had entered the victim's forehead at an angle, had hit a dense piece of bone, and had shattered into several pieces. She testified that the bottom part of the bullet had entered the victim's brain while the rest of the bullet came out an exit wound also on the victim's forehead. Harlan further testified that the gun had been a distance of two feet or greater from the victim when it was fired. She also testified that she found no powder burns on the victim.

Don Carmen, a forensic firearms expert with the TBI, testified that he had examined the defendant's nine millimeter Glock and determined that it had been in working order. He testified that the trigger safety, the drop safety, and the firing pin safety had all been functioning. He further testified that to fire this particular weapon, six and one-half pounds of pressure must be applied. He explained that for weapons with a "hair trigger," less than one pound of pressure will cause the gun to discharge. Other experts with the TBI testified that no identifiable fingerprints were found on the gun and that gunshot residue tests performed on both the defendant and the victim were inconclusive.

Following this testimony, the State concluded its case. The defendant offered the testimony of the victim's landlord and then testified in his own behalf. We find it unnecessary to recite his testimony in full. With regard to the night that the victim was shot, the defendant testified that he had gone to the victim's house because the victim seemed concerned about a window that would not close. He further testified that he had taken his gun with him because he felt he needed it for protection while traveling the back roads. He stated that he had loaded the gun immediately prior to entering the victim's home. The defendant further explained that he had had the gun in his pants and had taken it out to use the rest room. He stated that when he had returned from the rest room, the victim had the gun in her hand. He further testified that he walked over to her and asked her to give him the gun. He told the jury that he could not directly see the victim because the top bunk bed was blocking his view. He then testified that the victim had been holding the gun by its barrel and when he grabbed the gun out of the victim's hand, he heard a loud sound. He testified that he called the victim's name and then moved closer to her and discovered a hole in her forehead.

The defendant now challenges the sufficiency of the evidence. We find no merit to his challenge. Viewing the evidence in the light most favorable to the State, as we are required to do, we reach the conclusion that the State's evidence was sufficient beyond a reasonable doubt to convict the defendant of second-degree murder. First, the defendant admitted to Officer Rose that he had shot the victim. Second, the evidence presented by the State demonstrated that the shooting was not accidental. The evidence showed that the victim was shot in her forehead while her head was lying on a pillow. It further showed that the gun was at least two feet away from her when it discharged. Additionally, the medical examiner could find no evidence of powder burns on the victim, another indication that the victim was not holding onto the gun's barrel as suggested by the defendant. Other evidence showed that the gun used to kill the victim was in working

order and would not have accidentally discharged. Testimony from a TBI expert explained that six and one-half pounds of pressure are needed to fire this weapon, and that this weapon would not have fired with only accidental pressure being applied. From this evidence, we can only conclude that the defendant knowingly shot the victim and that he was aware that his conduct was reasonably certain to cause the victim's death. This issue is without merit. We affirm the defendant's second-degree murder conviction.

As his second issue, the defendant contends that the trial court erred in sentencing him to twenty years because the trial court improperly applied certain enhancement factors, because the trial court failed to apply mitigating factors, because the trial court placed too much emphasis on the enhancement factor regarding use of a firearm, and because the trial court failed to adequately place on the record the enhancing and mitigating factors relied upon in reaching the defendant's sentence.

When a defendant complains of his or her sentence, we must conduct a de novo review with a presumption of correctness. T.C.A. § 40-35-401(d). The burden of showing that the sentence is improper is upon the appealing party. T.C.A. § 40-35-401(d) Sentencing Commission Comments. This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

The Sentencing Reform Act of 1989 further provides that "[w]henever the court imposes a sentence, it shall place on the record either orally or in writing, what enhancement or mitigating factors it found, if any, as well as findings of fact as required by § 40-35-209." T.C.A. § 40-35-210(f) (emphasis added). Because of the importance of enhancing and mitigating factors under the sentencing guidelines, even the absence

of these factors must be recorded if none are found. T.C.A. § 40-35-210 comment. These findings by the trial judge must be recorded in order to allow an adequate review on appeal.

In this case, prior to sentencing the defendant, the trial judge simply stated: "Well, of course, this is just another senseless killing. It has no rhyme nor reason to it. Everybody seems to be armed these days. The first thing you know, you have somebody dead. People have pistols just like you used to carry chewing gum, or something." He made no findings as is required by the sentencing act. Thus, we are unable to adequately review this issue on appeal and are compelled to remand this cause to the trial court for resentencing. See T.C.A. §§ 40-35-209 & -210.

Thus, for the foregoing reasons, we affirm the defendant's conviction, but we remand the cause to the trial court for resentencing.

_____
JOHN H. PEAY, Judge

CONCUR:

_____
WILLIAM M. BARKER, Judge

_____
JERRY L. SMITH, Judge

8